[Civ. No. 24269. Second Dist., Div. Two. July 15, 1960.]

DORA BERNSON et al., Respondents, v. GEORGE E. BOWMAN, JR., et al., Appellants.

Charles O. Morgan, Jr., for Appellants.

Jack Flinn and John P. Brown for Respondents.

ASHBURN, J.—Appeal by defendants from order granting new trial in action for foreclosure of chattel mortgage and for incidental relief by way of award of attorney fee and deficiency judgment.[1] Judgment was entered upon a general verdict for defendants and the trial judge granted plaintiffs'

---

[1]Counsel do not discuss the question of whether a deficiency judgment may be rendered upon foreclosure of a purchase money chattel mortgage in an action which involves no lien upon realty (the type here under consideration). The question seems to be an open one in this state. Compare *Freedland* v. *Greco* (Cal.App.), 281 P.2d 633 with the superseding opinion of the Supreme Court in the same case reported in 45 Cal.2d 462 [289 P.2d 463]. As counsel have assumed that a deficiency judgment can be recovered in such an action we shall proceed upon that basis.

motion for new trial upon the expressed ground of insufficiency of the evidence.

■■ The rules governing review of such an order were stated by this court in *Brown* v. *Guy*, 144 Cal.App.2d 659, 661 [301 P.2d 413] : ''Upon the consideration of a motion for a new trial the court must make an independent appraisal of the evidence, including all presumptions and reasonable inferences, and must judicially determine whether the judgment effects a miscarriage of justice. ■■ In considering such motion the trial court is not bound by a conflict in the evidence but may be governed by any substantial proof that would reasonably warrant a judgment for the moving party even though such evidence consists of nothing more than inferences from established facts. ■■ On appeal from the order it will not be reversed unless the reviewing court concludes that as a matter of law there is no substantial evidence to support a contrary judgment.'' To this we added, in *Hughey* v. *Candoli,* 159 Cal.App.2d 231, 234 [323 P.2d 779], the following quotation from ''*Thomas* v. *Moore,* 146 Cal.App.2d 59, 61 [303 P.2d 624], . . . ' ''The trial court in considering a motion for new trial is not bound by a conflict in the evidence, and has not abused its discretion when there is any evidence which would support a judgment in favor of the moving party. [Citations.] The only conflict may be the opposing inferences deducible from uncontradicted probative facts. In such case the trial court may draw inferences opposed to those accepted by the jury, and may thus resolve the conflicting inferences in favor of the moving party, for 'It is only where it can be said as a matter of law that there is no substantial evidence to support a contrary judgment that an appellate court will reverse the order of the trial court.' [Citations.]'' ' ''

The amended complaint, upon which the case went to trial, relied so far as defendants Bowman are concerned upon a note and chattel mortgage given to plaintiffs[2] as part of the purchase price of a leasehold upon a certain hotel and the furnishings therein, and upon default in payments due under the note in the aggregate sum of $18,580.20 plus interest; the leasehold was owned by plaintiffs and was sold and assigned to defendants Bowman. As to defendants D'Orazi Investment Company and Victor W. D'Orazi, the complaint alleged the making of an agreement whereby the Bowmans constituted the defendant

---

[2]Plaintiff Ralph Bernson is successor in interest to Theodore Bernson, one of the original mortgagees, whose rights vested in Ralph upon his death prior to action brought.

D'Orazi Investment Company as manager of the hotel, also a "hold harmless agreement" executed by the D'Orazi corporation, with respect to all liabilities and operating obligations of the hotel. It was further alleged that both Bowman-D'Orazi agreements were made for the benefit of plaintiffs as third party creditor-beneficiaries. By amended answer all defendants joined in a defense of fraud in the sale of the leasehold from Bernsons to Bowmans, alleging that the Bowmans said "they were unwilling to enter into said agreement unless they were assured that said HOTEL CONTINENTAL was not used for any immoral purposes; that upon being so asked the said THEODORE BERNSON represented to defendants BOWMAN that the said hotel was not being used for any illegal or immoral purposes whatsoever; that in reliance upon said representation defendants BOWMAN entered into said agreement"; also that in fact Bernson well knew "that said representation was wholly false and untrue in that said hotel was commonly and frequently used by prostitutes for the purpose of carrying out their illegal profession." There was another plea of fraudulent misrepresentation concerning the income and expense of the hotel, but no mention of that issue is made in the briefs and so we disregard it.

With the complaint sounding in equity and the defense of fraud in law, the court submitted the entire case to a jury and propounded to them a series of interrogatories "so that we may determine quite definitely how the jury regards the weight of the evidence, the credibility of witnesses, and what facts are found on which your verdict is based." The two interrogatories which are presently pertinent and the answers thereto are as follows:

"INTERROGATORY No. 1: Did Theodore Bernson, on or prior to March 25, 1953, make false material misrepresentations that the Continental Hotel was a 'clean' hotel, and did said representations imply that the said hotel had not to his knowledge been used as a place where prostitution was openly and notoriously practiced and such fact was of general public knowledge affecting the reputation of said hotel, so as to make the leasehold of materially less value than would have been agreed to between seller and buyer, had such facts been made known to the buyer? YES 9. No 3''; "INTERROGATORY No. 3: If you answer both or either of Interrogatories No. 1 and No. 2 in the affirmative, you will answer the following question: Did George E. Bowman, Jr., and Gladys M. Bowman rely upon false and material misrepresentations and were thereby in-

duced to execute the note dated March 25, 1953? YES 7. No 4." Numbers 2 and 4 also failed to receive 9 votes, pro or con. Number 5, relating to ambiguity in the note received a 10 to 2 negative vote and therefore the 6th one needed no answer. General verdict for defendants being returned at the same time as the interrogatories, no objection was made to receiving the verdict or the interrogatories; all were filed and judgment for defendants entered upon the verdict.

Essentially the jury found that a false representation had been made as to a "clean" hotel, but failed to agree upon the question whether the Bowmans relied thereon. ▮ Failure to answer any interrogatory does not vitiate the general verdict when filed in such circumstances (*Benson* v. *Southern Pacific Co.,* 177 Cal. 777, 781 [171 P. 948]; *California Well Drilling Co.* v. *California Midway Oil Co.,* 178 Cal. 337, 340 [177 P. 849]; *Van Damme* v. *McGilvray Stone Co.,* 22 Cal. App. 191 [133 P. 995]; 48 Cal.Jur.2d, § 268, p. 275). ▮ The general verdict and the interrogatories are to be read and construed together. (*Morgan* v. *Nesbitt,* 14 Cal.App. 747, 749 [113 P. 125]; 48 Cal.Jur.2d, § 267, p. 274.) ▮ "The purpose of special interrogatories is therefore to test the validity of the general verdict by determining whether all of the facts essential to the support of the general verdict were established to the satisfaction of the jury." (2 Witkin, California Procedure, § 81, p. 1812.)

*Plyer* v. *Pacific etc. Cement Co.,* 152 Cal. 125, 130 [92 P. 56], is pertinent here: "It is of course true, but no truer today than it always has been, that a general verdict implies a finding in favor of the prevailing party of every fact essential to the support of his action or defense, and the very purpose of special findings is to test the validity of the general verdict by ascertaining whether or not it may have been the result of a misapplication of the law to actual findings in material conflict with the findings which in their absence would be implied from the general verdict. In other words, the response of the jury to the special issues or particular questions of fact may show that no judgment can properly be entered in favor of a plaintiff upon a general verdict because the jury has not found in his favor upon some material issue, or has found against him as to some fact fatal to his cause of action, and in case of a general verdict for a defendant the special findings, together with the facts admitted on the record may show that the plaintiff is entitled to a judgment notwithstanding the general verdict against him."

We have a general verdict of fraud based upon misrepresentation of fact, but no jury agreement upon the question of whether it was the inducement to the transaction. The least that can be said is that the situation challenged the court's attention to the sufficiency of the evidence to support an implied finding of reliance upon the representation in question. The testimony of defendant George E. Bowman is enough to sustain the court's ruling that the evidence is insufficient in the sense that it preponderates against the defendants. Bowman said: "Q. By Mr. Morgan: Would you continue, again confining yourself just to what you recall was said between each party. A. As I say, he was—— . . . various things were said. He was really trying to get me to take the leasehold, and so he said that he would show me the books. . . . Q. By Mr. Morgan: Did you hear the words 'clean house'? A. Yes; definitely, because I didn't know what that meant, actually. Q. Did you have any understanding as to what he meant by a 'clean house'? A. Well, my first impression was to argue with him because it was dirty physically, was my idea; and I was going to say something to that effect, physically dirty. And so my only other impression was that he meant, everything he was leading up to, it was on the up and up. And I didn't press him any further because I didn't know exactly what he did mean. Q. Have you told us now all of the conversation you recall taking place in this second conversation? . . . A. Yes, I think so." Also: "Q. By Mr. Morgan: When you bought this business, Mr. Bowman, what intentions did you have as to the type of business you were buying? A. That I was buying a going hotel operation. Q. When you bought this business, what intentions did you have as to the legality or illegality of the operation? A. Well, it didn't enter into my mind, such things as illegality, as I think I tried to testify. So that was all— seemed to be of no concern to me. It had to be legal, as far as I was concerned, about everything. So that was automatic, as far as I was concerned. Q. It was automatically, you assumed, to be legal; is that correct? A. Yes." Without reliance there could be no legally cognizable fraud and without fraud the Bowmans had no defense to the action.

It is true that appellants likewise rely upon fraudulent concealment of the fact that a red light abatement action had been filed against the hotel in 1951, during the Bernsons' occupancy (which was from November 15, 1950, to March 25, 1953); apparently an injunction had been granted but the hotel was not closed; the injunction was not "lifted" until the Bernsons

sold their leasehold to the Bowmans. Officer Overstreet testified that the "character" of the hotel was "generally bad, based on the number of arrests that I was personally·acquainted with, those problems, from 1951 until 1953, and on into 1954, in fact." His attention being called to March 25, 1953, as the latest pertinent date, he further said: "I believe, the last major arrest was, in August of 1953. The character of the place generally was bad. Q. By Mr. MORGAN: Bad in what respect? A. Bad in activity of prostitution and known gambling." On cross-examination the officer testified that although numerous investigations were made from 1951 on through 1953, there was only one arrest of a prostitute while the Bernsons were operating, which was about six months after they took over, and that neither of the Bernsons was connected with such trade so far as he knew. Mrs. Bernson testified she knew of no prostitution; Mr. Bernson is dead and the presumption is in his favor. Other matters to which Overstreet and Bowman testified in this connection are strictly hearsay and, though received without objection, were subject to evaluation as such by the trial judge. His implied finding in favor of plaintiffs upon this issue cannot be rejected.

For another reason it seems clear that the trial judge's handling of the fraud issue upon the motion for new trial was proper. The leasehold was sold to the Bowmans about March 25, 1953. D'Orazi says that Bowman began to complain to him in May, 1953, but it does not appear that any such complaint was ever made to the Bernsons. Bowman and D'Orazi continued together in the operation of the hotel until Bowman's interest in the lease was sold by him to D'Orazi on January 1, 1957, for $10,000. D'Orazi continued to operate until he sold to one Arnold in late 1957 for an undisclosed consideration. No rescission of the deal was ever attempted or claimed in the amended answer or at the pretrial conference. The first amended complaint was filed on June 4, 1957; the original answer of July 18, 1957, said nothing about fraud; that defense was first raised by amendment to answer which was filed on August 12, 1958. There was no showing of actual damage at the trial; *non constat* but that appellants received for their respective interests sums which precluded the existence of damage, which is of the essence of the defense of fraud as well as an action therefor. ■ "Fraud without damage furnishes no ground for action; nor is fraud without damage a defense." (*Holton* v. *Noble*, 83 Cal. 7, 9 [23 P. 58].) See also *Hunter* v. *McKenzie*, 197 Cal. 176, 183 [239 P. 1090]; *Wood-*

*son* v. *Winchester,* 16 Cal.App. 472, 476-477 [117 P. 565].

The trial judge properly could have concluded that defendants' continued dealing with the subject matter of the allegedly fraudulent sale and D'Orazi's sale of same to another, all without making complaint of misrepresentation to the Bernsons, coupled with the other facts above mentioned, worked a waiver of that defense. This is a question of fact raised by the implied replication to the defense of fraud. (*French* v. *Freeman,* 191 Cal. 579, 590 [217 P. 515] ; *Chung* v. *Johnston,* 128 Cal.App.2d 157, 165 [274 P.2d 922].) Certainly there was substantial evidence to support that conclusion.

Counsel for appellants now argue that defendants D'Orazi in no event can be personally liable to plaintiffs because the "hold harmless" agreement did not constitute plaintiffs third party creditor-beneficiaries with respect to the note obligations upon which suit is based.

The complaint does not allege breach of obligations of the lease, but nonpayment of installments due on the purchase money note and chattel mortgage given to plaintiffs Bernsons when they sold their existing leasehold to Bowmans. It is alleged and denied that the D'Orazis "undertook and promised, under the terms of the said agreement, to pay the installments on the said note as they came due, and to fulfill all other executory conditions of said agreement of sale, and to pay the entire balance of said note if at the option of the holder thereof upon default in the payments thereon the entire remaining balance of said note became and were declared by the holder to be due and payable immediately together with interest accrued to the date of payment." No parol evidence to the effect that the agreements encompassed payment of the obligations on the note was received; when proffered it was excluded by the trial judge and counsel for plaintiffs expressed agreement with the ruling. The written agreements are not ambiguous; they cover obligations under the lease but not those of the promissory note and chattel mortgage. This point was raised by defense counsel upon motion for directed verdict. The court remarked : "The case has been tried upon the theory that if the Bowmans were liable that D'Orazi would be liable. Had you pressed that point at the beginning, I would have insisted that there was a conflict of interest and that the parties should be represented by separate counsel. . . . I am inclined to feel that the theory on which the case was tried and the evidence presented to the jury has been in effect a waiver of such a plan [*sic*] that D'Orazi was not bound even though the Bowmans

might be bound and held liable on the note, and that is a further ground for denying the motion.'' The record does not support this statement of the theory of the trial. But if it did that fact would not change the result for that theory of trial (if actually pursued) was one of law untrammeled by any conflicts of fact.

 ''It is the general rule that a party to an action may not, for the first time on appeal, change the theory of the cause of action. (*Ernst* v. *Searle*, 218 Cal. 233, 240 [22 P.2d 715] ; *Gray* v. *Janss Investment Co.*, 186 Cal. 634, 641 [200 P. 401].) There are exceptions but the general rule is especially true when the theory newly presented involves controverted questions of fact or mixed questions of law and fact. If a question of law only is presented on the facts appearing in the record the change in theory may be permitted. (See *Schirmer* v. *Drexler*, 134 Cal. 134 [66 P. 180].) But if the new theory contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at the trial the opposing party should not be required to defend against it on appeal.'' (*Panopulos* v. *Maderis*, 47 Cal.2d 337, 340-341 [303 P.2d 738].)

 ██ In *American Auto. Ins. Co.* v. *Seaboard Surety Co.*, 155 Cal.App.2d 192, 200 [318 P.2d 84], this court said: ''If it be said that the views herein expressed depart from the theory upon which the case was tried the answer is that the rule confining the parties upon appeal to the theory pursued below does not apply to a question which is one of law only (*Panopulos* v. *Maderis*, 47 Cal.2d 337, 341 [303 P.2d 738]), and that an appellate court is never bound by concessions of counsel as to the applicable law (*Desny* v. *Wilder*, 46 Cal.2d 715, 729 [299 P.2d 257]) or by the interpretation of documents made by the trial court upon the basis of the terms of the written instrument without the aid of other evidence (*Estate of Platt*, 21 Cal.2d 343, 352 [131 P.2d 825] ; *Continental Cas. Co.* v. *Phoenix Constr. Co.*, *supra*, 46 Cal.2d 423, 429-430 [296 P.2d 801, 57 A.L.R.2d 914]).''

*Ward* v. *Taggart*, 51 Cal.2d 736, 742 [336 P.2d 534], states: ''Although this theory of recovery was not advanced by plaintiffs in the trial court, it is settled that a change in theory is permitted on appeal when 'a question of law only is presented on the facts appearing in the record. . . .' (*Panopulos* v. *Maderis*, 47 Cal.2d 337, 341 [303 P.2d 738] ; *American Auto. Ins. Co.* v. *Seaboard Surety Co.*, 155 Cal.App.2d 192, 200 [318 P.2d 84].)''

There being no parol evidence upon the subject, an examination of the Agreement to Manage Hotel and the Hold Harmless agreement made between Bowmans and D'Orazi discloses that they do not embrace any covenant, express or implied, on the part of D'Orazis, or either of them, to pay any of the obligations to accrue upon the note and chattel mortgage. The record at bar shows that as a matter of law there is no substantial evidence to support a judgment against either of the D'Orazis. Hence, it was reversible error to grant a new trial as to them.

Order granting new trial is affirmed as to defendants Bowman and reversed as to defendants D'Orazi.

Fox, P. J., and Richards, J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.